USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: FEB 2 7 2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
COMM TRADE USA, INC.,                      :
                                           :
                           Plaintiff,      :        13 Civ. 3998 (KBF)
              -v-                          :
                                           :        OPINION & ORDER
                                           :
INTL FCSTONE, INC., et al.,                :
                                           :
                           Defendants.     :
                                           :
-------------------------------------------------------X

KATHERINE B. FORREST, District Judge:

Before the Court is a motion filed by defendants INTL FCStone and INTL

Commodities (collectively, "INTL") to dismiss plaintiff's complaint or for summary

judgment on the grounds, inter alia, that an exhibit to the contract in question was

a condition precedent to performance under the contract and that plaintiff's

complaint is time-barred.  (ECF No. 23.)  For the following reasons, defendants'

motion for summary judgment is GRANTED IN PART and DENIED IN PART.

I.     BACKGROUND

       A.  Factual Background

The following facts are undisputed, unless stated otherwise.

This case arises from a June 3, 2009 agreement ("the Agreement") between

two executives of defendant INTL (Jim Mammone and Steven Lee) and the

president of plaintiff Comm Trade (Bryan Rosenstrauch).  (See Am. Compl. Ex. A

("Agreement"), ECF No. 13; Defs.' Local Civil Rule 56.1 Statement ("Defs.' 56.1") ¶¶

1–2, 4–7, ECF No. 28; Pl.'s Opp. to Defs.' Rule 56.1 Statement ("Pl.'s 56.1") ¶¶ 1–2,

4–7, ECF No. 35.)  Prior to that date, defendants had sometimes paid plaintiff

different rates of commissions for transactions that resulted from plaintiff's

introductions.  (Rosenstrauch Decl. ¶ 60, ECF No. 49.)

 The Agreement sets forth a process for plaintiff to be designated as

defendants' commission agent for a third party.  (Agreement ¶¶ 3–4.)  It provides

that plaintiff "will receive a commission on all introductions based on $10 per ton

unless otherwise mutually agreed upon and entered into Exhibit II."  (Id. ¶ 3.)  The

Agreement further states that, in the event of a dispute, "no action shall be

entertained . . . if filed more than one (1) year subsequent to the date the cause(s) of

action actually occurred, regardless of whether damages were otherwise as of said

time calculable."  (Id. ¶ 7.)  The Agreement provides that "the terms and conditions

thereof may not be further modified except by a writing signed by both Parties."

(Id. ¶ 8.)  Finally, Exhibit I to the Agreement states, "By signing and dating next to

an introduction below, INTL agrees CT may act as their agent to that entity of the

purchase or sale of various materials."  (Id. Ex. I.)

 After both parties had executed the Agreement but at the same meeting,

Rosenstrauch and Mammone prepared a handwritten list of "introductions."  (Defs.'

56.1 ¶ 10; Pl.'s 56.1 ¶ 10.)  According to plaintiff, this list included "introductions"

that defendants had already made to plaintiff during the months leading up to the

Agreement and that would qualify for commissions.  (See Pl.'s 56.1 ¶¶ 10, 13.)

According to defendants, this was a "list of third parties for which Comm Trade

wanted to be INTL Commodities' agent." (Defs.' Mem. of L. in Supp. of Their Mot. to Dismiss ("Defs.' Mot.") 11, ECF No. 24.) Plaintiff claims that this list was entrusted to defendants to type up and send to plaintiff. (Am. Compl. ¶ 52.) According to defendants, the list may have been lost during an office move; neither party has produced the list. (Lee Decl. ¶¶ 13–14, 17, ECF No. 25; Mammone Decl. ¶¶ 11–12, ECF No. 26; Defs.' 56.1 ¶ 12.) The parties did not sign a list of the 64 entities in Exhibit B to the amended complaint ("List of Introductions by Comm Trade to INTL"), or sign any other document agreeing that plaintiff had introduced defendants to those entities. (Defs.' 56.1 ¶¶ 11, 15, 16; Pl.'s 56.1 ¶¶ 11, 15, 16.) No list of any kind was ever signed or incorporated into the Agreement. (Lee Decl. ¶ 16; Mammone Decl. ¶ 13.)

Later in 2009, Rosenstrauch became displeased that the list of "introductions" had never been formalized. (Lee Decl. ¶ 15; Mammone Decl. ¶¶ 11–12.) In August 2009, Mammone told Rosenstrauch in an email that plaintiff's "prices don't work," and suggested that Rosenstrauch "get on a plane and find new customers that INTL can supply." (Rosenstrauch Decl. ¶ 66.) This development, together with Mammone's statements that counterparties introduced by plaintiff were no longer suitable for defendants' scrap metal trading operation, led Rosenstrauch to believe that defendants' business with counterparties that had been introduced by plaintiff was ending. (Id. ¶ 67.)

Rosenstrauch nevertheless continued to request trading information and attempt a resolution with Mammone until July 2012. (Id. ¶ 68.) On December 22,

2009, Rosenstrauch requested the list of entities from Mammone. (Mammone Decl. Ex. A.) Mammone told Rosenstrauch that defendants would not agree to the handwritten list from the June 3, 2009 meeting, but he invited Rosenstrauch to send a list to him. (Id.) Specifically, he wrote, "Don't hold your breath as I've asked Steven [Lee] for it many times. If you feel you need it, please send your own." (Id.)

On December 30, 2010, defendants agreed to raise plaintiff's commission to $20 per metric ton for every ton that defendants traded with parties whom plaintiff had introduced to defendant. (Pl.'s 56.1 ¶ 5.)

According to plaintiff, defendants have failed to provide the information to plaintiff that plaintiff needs in order to bill defendants for payment, and defendants are far behind in their obligations under the Agreement. (Am. Compl. ¶¶ 80–83, 105.) Plaintiff also claims that defendants consistently assured plaintiff that they would make good on its obligations. In a February 11, 2012 email to Rosenstrauch, Mammone wrote, "Have got zero cooperation from my side but gonna find a way. Best if it can be done thru new business but will do all I can to include a cash component if you insist, so do you insist and what's your idea on both minimum cash and new business." (Id. ¶ 111.) After four more months of discussion, Mammone told Rosenstrauch in July 2012, "You have to get over it and move on." (Id. ¶ 112.)

Defendants requested certain invoices from plaintiff and paid plaintiff certain commissions after the Agreement was signed. (See Pl.'s Surreply on Mot. to

Dismiss ("Pl.'s Surreply") Ex. 12(b) (Lee Deposition), at 82, 94–96, 146, ECF No. 48; Pena Decl. ¶¶ 4, 5, 6, Exs. A, B, C, ECF No. 50.)

In January 2013, Lee informed Rosenstrauch that defendants had done extensive business with a number of individuals and organizations that plaintiff claims to have introduced to defendant. (Rosenstrauch Decl. ¶ 69; id. Ex. B ("List of Introductions by Comm Trade to INTL").)

According to Rosenstrauch, during the period at issue in the complaint, defendant lacked an Administration of Quality Supervision, Inspection and Quarantine ("AQSIQ") license that it needed to ship into China. (Rosenstrauch Decl. ¶ 71.) Defendant began to use plaintiff's AQSIQ license to ship into China in early 2009 and agreed to compensate plaintiff for its use. (Id. ¶ 73.) Plaintiff and defendant verbally entered into this agreement in 2009 and committed the agreement to writing in 2010. (Id.)

B. Procedural History

On June 11, 2013, plaintiff filed the complaint in this action. (ECF No. 1.) The complaint alleges that defendants breached the Agreement by failing to provide information to enable plaintiff to identify the volume of defendants' trade based on introductions that plaintiff had made, and by failing to pay money that is due to plaintiff from those introductions. (Am. Compl. ¶ 117.) The complaint also alleges unjust enrichment and promissory estoppel. (Id. ¶ 124.) On August 13, 2013, plaintiff filed an amended complaint. (ECF No. 13.)

On September 16, 2013, defendants filed a motion to dismiss or, in the alternative, a motion for summary judgment. (ECF No. 23.) On October 18, 2013, the Court heard oral argument on several issues related to the motion. (See ECF Nos. 38, 39.) On November 9, 2013, plaintiff filed a surreply to defendants' motion. (ECF No. 48.) The motion became fully briefed on November 22, 2013. (ECF No. 56.)

II.   STANDARD OF REVIEW

Summary judgment may not be granted unless a movant shows, based on admissible evidence in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On summary judgment, the Court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010).

Once the moving party has asserted facts showing that the nonmoving party's claims cannot be sustained, the opposing party must set out specific facts showing a genuine issue of material fact for trial. Price v. Cushman & Wakefield, Inc., 808 F. Supp. 2d 670, 685 (S.D.N.Y. 2011); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," because "[m]ere conclusory allegations or denials . . . cannot by themselves create a

6

genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citations omitted); see also Price, 808 F. Supp. 2d at 685 ("In seeking to show that there is a genuine issue of material fact for trial, the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial.").

Only disputes relating to material facts—i.e., "facts that might affect the outcome of the suit under the governing law"—will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (stating that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). The Court should not accept evidence presented by the nonmoving party that is so "blatantly contradicted by the record . . . that no reasonable jury could believe it." Scott v. Harris, 550 U.S. 372, 380 (2007); see also Zellner v. Summerlin, 494 F.3d 344, 371 (2d Cir. 2007) ("Incontrovertible evidence relied on by the moving party . . . should be credited by the court on [a summary judgment] motion if it so utterly discredits the opposing party's version that no reasonable juror could fail to believe the version advanced by the moving party.").

III.    DISCUSSION

A. Claims Against INTL FCStone

The complaint in this action alleges claims against both INTL FCStone, Inc. and INTL Commodities, Inc.  Plaintiff does not suggest an independent theory of liability against INTL FCStone but rather has sued it in its capacity as the parent of INTL Commodities.

In New York, "a parent corporation and its subsidiary are regarded as legally distinct entities." Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc., 2 F.3d 24, 26 (2d Cir. 1993).  A parent company is liable for a subsidiary's actions only when the "parent corporation . . . dominate[s] the finances, policies, and business practices of the subsidiary corporation to such an extent that the subsidiary has no separate existence of its own." Celi v. Canadian Occidental Petroleum Ltd., 804 F. Supp. 465, 468 (E.D.N.Y. 1992).  Numerous factors are involved as part of this inquiry.  See Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc., 933 F.2d 131, 139 (2d Cir. 1991) (listing factors involving the interactions between parent and subsidiary, including "overlap in ownership, officers, directors, and personnel"; "common office space, address and telephone numbers of corporate entities"; and "the amount  of business discretion displayed by the allegedly dominated corporation").

Here, plaintiff raises a triable issue as to whether INTL FCStone so dominates INTL Commodities that the Court can pierce the corporate veil of the corporate parent.  Plaintiff argues that INTL Commodities is "difficult to

8

distinguish" from INTL FCStone, because the two defendants share the same office, INTL Commodities' employees identify themselves as INTL FCStone's employees, and their financial statements are consolidated. (Pl.'s Opp. to Defs.' Mot. to Dismiss ("Pl.'s Opp.") 5–6, ECF No. 32.) Those facts appear within the factors set forth by the Second Circuit in <u>Passalacqua</u>, 933 F.2d at 139, and raise a triable issue as to whether the Court may pierce INTL corporate veil. Plaintiff's claims shall therefore proceed against both INTL Commodities and INTL FCStone.

### B. Exhibit I as Condition Precedent to Payment

#### 1. Existence of Condition Precedent

Defendants argue that the Agreement contains a condition precedent that was not satisfied, and that they are therefore not obligated to perform under the contract. "A condition precedent is an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises." <u>Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.</u>, 86 N.Y.2d 685, 690 (1995) (citations and internal quotation marks omitted). For the reasons set forth below, while a condition precedent existed to the Agreement, a triable issue of fact exists as to whether defendants waived it.

Defendants argue correctly that Exhibit I states a condition precedent for the contract. That exhibit sets forth a process for the parties to agree upon "introductions." Exhibit I states, "By signing and dating next to an introduction below, INTL agrees CT may act as their agent to that entity of the purchase or sale of various materials," and includes a form for introductions to be logged,

countersigned, and dated. (Agreement Ex. I.)  Those actions are prerequisites for plaintiff to act as defendants' agent for a particular third party and therefore prerequisites for plaintiff to be paid commissions.  Because plaintiff did not meet this requirement for the third parties listed in Exhibit B, plaintiff has not satisfied the condition precedent to performance.  See Baraliu v. Vinya Capital, L.P., 763 F. Supp. 2d 289, 299 (S.D.N.Y. 2011);  David Fanarof, Inc. v. Dember Constr. Corp., 600 N.Y.S.2d 226, 227–28 (App. Div. 1st Dep't 1993) ("When commercial parties expressly agree that a specified occurrence shall be a condition precedent to the creation or enforceability of a right or obligation, and there is no ambiguity arising out of other language in their contract, the only question for the court is whether the condition precedent has been complied with.") (citation omitted).

Plaintiff argues that Exhibit I is insufficient to constitute a condition precedent, because a condition requires "unmistakable language of condition." Oppenheimer, 86 N.Y.2d at 691.  The Court disagrees.  The language of Exhibit I— only "[b]y signing and dating" can plaintiff become defendants' agent (Agreement Ex. I)—is clear enough on its face to make its completion a condition precedent.

Plaintiff also argues that Exhibit I is not integrated into the Agreement, because the Agreement itself (without the exhibit) states that "[t]his instrument contains the entire agreement of the Parties." (Agreement ¶ 8.)  This argument also fails.  Exhibit I is not merely appended to the Agreement; it begins on the page of the agreement bearing the parties' signature.  Paragraph 3 of the Agreement— stating that plaintiff "will receive a commission on all introductions in the amount

of $10 per ton" and that such commissions "will only be payable after collection of all proceeds of any sale" (Agreement ¶ 3)—must therefore be read in conjunction with Exhibit I. See Chan v. Smith, No. 13 Civ. 4724 (HB), 2013 WL 5290717, at *3 (S.D.N.Y. Aug. 19, 2013) (rejecting a reading of a contract that "would render" another provision "a nullity").

### 2. Waiver of Exhibit I

Although there was a condition precedent to the Agreement, there is a triable issue as to whether defendants waived that condition. A waiver is "the voluntary and intentional abandonment of a known right." Readco, Inc. v. Marine Midland Bank, 81 F.3d 295, 303 (2d Cir. 1996).[1] A party may waive a condition precedent to performance by hindering its completion or by "knowingly, voluntarily, and intentionally abandon[ing]" it. See Weniger v. Union Ctr. Plaza Assocs., 387 F. Supp. 849, 865 (S.D.N.Y. 1974); Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P., 7 N.Y.3d 96, 105 (2006). "[T]here is no waiver where the failure to exercise this right was the result of negligence, oversight, or thoughtlessness." Readco, Inc. v. Marine Midland Bank, 81 F.3d 295, 303 (2d Cir. 1996) (internal quotation marks omitted).

Here, plaintiff proffers facts that create a triable issue on this question.

---

[1] The Court is mindful that the contract contains a provision prohibiting a modification to the "terms and conditions . . . except by a writing signed by both Parties." (Agreement ¶ 8.) Such clauses are to be "afforded great deference" by the courts. Ixe Banco, S.A. v. MBNA Am. Bank, N.A., No. 07 Civ. 432 (LAP), 2008 WL 650403, at *9 (S.D.N.Y. Mar. 7, 2008). However, that is not an ironclad requirement, and a party may nonetheless show that the parties' conduct is incompatible with the terms of the agreement and that a waiver occurred. See id.

Defendants paid plaintiff for purchases and sales—allegedly because of introductions made by plaintiff—after the Agreement was signed and without the completion of Exhibit I. (See Am. Compl. ¶ 64; Pl.'s Surreply Ex. 12(b), at 146.) Plaintiff has proffered a report of transactions between plaintiff and defendants and spreadsheets detailing various invoices that defendants paid beginning in July 2009 and continuing to late 2012. (Pena Decl. ¶¶ 4, 5, 6, Exs. A, B, C.) An email from Lee to Rosenstrauch requested that Rosenstrauch "send [him] an invoice." (Id. at 82; see also id. at 94–96.) Plaintiff claims that, on December 8, 2009, Mammone promised Rosenstrauch that plaintiff would be paid. (Am. Compl. ¶ 62.) Finally, on December 22, 2009, Mammone sent an email in which he stated that defendants were "waiting for commission back up/revised Invoices." (See Mammone Decl. Ex. A.) None of these communications mentioned a completed Exhibit I as necessary to consummating the transactions.

Defendant argues that the mere existence of transactions between plaintiff and defendant, both before and after the execution of the Agreement, are insufficient to show the voluntary and intentional relinquishment of a known right. If anything, defendants argue, these "spotty payments . . . reflect a continuation of [the] ad hoc commission relationship" that began before the Agreement was signed. (Defs.' Resp. to Comm Trade's Surreply 7, ECF No. 56.) The record of continuing payments over several years—as well as a sequence of emails discussing invoices and payments, with no mention of Exhibit I—creates a genuine question of material fact on the question of waiver. See, e.g., Wyeth v. King Pharms., Inc., 396

F. Supp. 2d 280, 291–92 (E.D.N.Y. 2005).  At no point did defendants complain that they lacked a completed Exhibit I, even when the Agreement was the topic of continuing conversation between the parties.  Furthermore, defendants cannot ignore that they signed the Agreement and claim that payment of those commissions was a continuation of an "ad hoc commission arrangement" that predated the Agreement.

For these reasons, defendants' argument that they are not obligated to perform under the contract due to plaintiff's failure to satisfy a condition precedent fails.

### C. Quasi-Contract Claims

Defendants next argue that plaintiff's unjust enrichment and promissory estoppel claims should be dismissed.  "[A] quasi-contractual obligation is one imposed by law where there has been no agreement or expression of assent, by word or act, on the part of either party involved."  Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 388–89 (1987).

The parties here do not dispute that the Agreement is a valid and enforceable contract that governs plaintiff's allegations, at least with respect to commissions paid for introductions.  (See Defs.' Mot. 8; Pl.'s Opp. 11.)  "As the parties' relationship was defined in written contracts, the validity and enforceability of which are not in question, [plaintiff's unjust enrichment] claim necessary fails."  GMA Accessories, Inc. v. ePartners Inc., No. 07 Civ. 8414 (LAK), 2008 WL 781188, at *1 (S.D.N.Y. Mar. 19, 2008).  Similarly, plaintiff's promissory estoppel claim,

which appears to seek the same relief as its breach of contract claim (see Compl. ¶¶ 126–29), must be dismissed because it is redundant of the breach of contract claim. See Hall v. EarthLink Network, Inc., 396 F.3d 500, 508 (2d Cir. 2005) ("If the allegations do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated.").

Accordingly, defendants' motion is granted as to plaintiff's unjust enrichment and promissory estoppel claims (plaintiff's second and third causes of action) with respect to commissions for introductions.

### D. The Statute of Limitations

Defendants further argue that plaintiff's complaint is time-barred. For the following reasons, the Court agrees that plaintiff's complaint is time-barred, but only insofar as it alleges claims based on trading that occurred before June 11, 2012.

The Agreement contains a limitations period of one year. (See Agreement ¶ 7.) Under New York law, the parties are permitted by contract to shorten the otherwise applicable statute of limitations. See, e.g., Chase v. Columbia Nat'l Corp., 832 F. Supp. 654, 659–60 (S.D.N.Y. 1993) ("A shortened time period will be upheld if it is reasonable and voluntarily agreed to, although the intention to establish a shorter period must be clearly set forth.") (citations omitted). New York courts have upheld one-year contractual limitations periods. See, e.g., Diana Jewelers of

Liverpool, Inc. v. A.D.T. Co., 562 N.Y.S.2d 305, 305 (App. Div. 4th Dep't 1990). The one-year limitations period in the Agreement here is similarly clearly set forth and thus enforceable. (See Agreement ¶ 7.)

1. Breach of Contract as to Trades Before June 11, 2012

Plaintiff filed its complaint on June 11, 2013. (ECF No. 1.) However, defendants have rebuffed plaintiff's requests for information and commissions as far back as August 2009. (Lee Decl. ¶ 15; Mammone Decl. ¶¶ 11–12.) Rosenstrauch continually requested payment from Mammone, and stated that plaintiff was unable to bill defendants without invoices. In August 2009, Mammone told Rosenstrauch that his "prices don't work." (Rosenstrauch Decl. ¶ 66.) On December 22, 2009, Rosenstrauch requested the list of entities from Mammone. (Mammone Decl. Ex. A.) In response to Rosenstrauch's demand for the list of third parties for which plaintiff would serve as defendants' designated agent, Mammone wrote, "[D]on't hold your breath," and told Rosenstrauch to propose his own list. (Mammone Decl. ¶ 12, Ex. A.)

Plaintiff then continued throughout 2010 and until July 2012 to request an accounting and payment from defendants for introductions it claimed to have made, including past commissions that were unpaid and in arrears, but defendants failed to pay plaintiff. (Rosenstrauch Decl. ¶ 68.) Plaintiff further alleges that Mammone promised Rosenstrauch that defendants would process commissions, that commissions in arrears "would be taken care of," and that payment was forthcoming. (Id.) Plaintiff claims that defendants should have paid plaintiff

15

$720,000 for transactions in 2010, but actually paid only $54,800; that they should have paid plaintiff at least $2,640,000 for transactions in 2011, but only paid $21,000; and that they should have paid plaintiff approximately $1,800,000 in 2012, but paid plaintiff nothing.  (Am. Compl. ¶¶ 73–74, 79–82.)

Thus, certain of plaintiff's claims may have accrued as early as December 2009, when defendants failed to provide plaintiff with the necessary information for plaintiff to be compensated.  Because plaintiff claims to have been underpaid in 2010 and 2011 as well as 2012, certain claims certainly accrued before June 11, 2012—one year prior to filing the complaint.[2]

Plaintiff claims that its cause of action as to all claims did not accrue until either July 2012 or January 2013, because plaintiff had not, until those times, "acquire[d] actual knowledge of the facts that comprise[d its] cause of action." Long v. Abbott Mortg. Corp., 459 F. Supp. 108, 113 (D. Conn. 1978).  Plaintiff asserts that it believed that defendants would honor the Agreement until July 2012, when Mammone told Rosenstrauch, "You have to get over it and move on." (Am. Compl. ¶ 112.)  Alternatively, plaintiff argues that its cause of action accrued in January 2013, because it was not until then that Lee told Rosenstrauch "that INTL conducted extensive business with most of the individuals and organizations Comm Trade USA, Inc. introduced to INTL." (Rosenstrauch Decl. ¶ 6.)

---

[2] Contrary to plaintiff's claim, defendants need not specify an exact date on which it believes the action accrued.  By outlining the timeline of requests for payment and defendants' failure to pay over the course of several years, defendants have met their "initial burden of establishing prima facie that the time in which to sue has expired." Swift v. New York Med. Coll., 25 A.D.3d 686 (N.Y. App. Div. 2d Dep't 2006). (See Opp. to Defs.' Mot. to Dismiss ("Pl.'s Opp.") 13, ECF No. 32.)

Plaintiff's argument fails. "[I]t is well settled that the statute of limitation for breach of contract begins to run from the day the contract was breached, not from the day the breach was discovered, or should have been discovered." ABB Indus. Sys., Inc. v. Prime Tech., Inc., 120 F.3d 351, 353 (2d Cir. 1997). The date on which plaintiff supposedly discovered defendants' alleged breach is thus irrelevant. The relevant date is that on which the breach occurred. Plaintiff's complaint alleges that defendants failed to provide plaintiff with the information it sought in order to bill defendants for payment beginning in December 2009 and continuing to today. (Am. Compl. ¶¶ 62, 105.) Plaintiff's complaint also alleges that defendants failed to pay plaintiff commissions beginning at least in 2010 and continuing to today. (Id. ¶¶ 67, 69, 70, 75, 105.) It is therefore clear that plaintiff's claims accrued well before June 11, 2012. (See, e.g., id. ¶¶ 67–70, 75, 80–83, 111–12; Lee Decl. ¶ 15; Mammone Decl. ¶¶ 11–12, Ex. A.)

In the alternative, plaintiff argues that defendants should be equitably estopped from asserting the statute of limitations as to any claims related to transactions before June 2012. "A defendant may be equitably estopped from asserting the statute of limitations in cases where the plaintiff knew of the existence of his cause of action but the defendant's conduct caused [the plaintiff] to delay in bringing his lawsuit." Buttry v. Gen. Signal Corp., 68 F.3d 1488, 1493 (2d Cir. 1995) (alteration in original) (internal quotation marks omitted). According to plaintiff, because Mammone continually promised Rosenstrauch that defendants would process the commissions and pay plaintiff (see, e.g., Am. Compl. ¶¶ 68–70),

17

defendants' conduct caused plaintiff to delay bringing this lawsuit. (See Pl.'s Opp. 14.)

This equitable estoppel theory is of no assistance to plaintiff. "In New York, . . . a defendant may be estopped to plead the Statute of Limitations where plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action." Golden Budha Corp. v. Canadian Land Co. of Am., N.V., 931 F.2d 196, 200 (2d Cir. 1991) (internal quotation marks omitted). However, the record here does not contain evidence that defendants expressly defrauded or deceived plaintiff or that defendants misrepresented themselves in an attempt to induce plaintiff to refrain from exercising its right to sue. At worst, plaintiff proffers evidence that defendants blamed software issues, administrative problems, or plaintiff's invoicing for their failure to provide accurate data to plaintiff. (See Pl.'s Surreply 17–19.)[3] The few emails proffered by plaintiff are insufficient to meet the high bar for equitable estoppel. In fact, the record also contains statements undermining plaintiff's estoppel argument: "[d]on't hold your breath," "our business together has completely fallen off the charts," "your prices don't work," and "[y]ou have to get over it," among others. (Am. Compl. ¶ 112; Mammone Decl. Ex. A; Pl.'s Surreply Exs. 6, 22, ECF No. 48.) Thus, to the extent that Rosenstrauch relied on Mammone's promises that payments was forthcoming, any such reliance was

---

[3] The other facts that plaintiff recites—that defendants promised forthcoming revised and accurate reports on data (notably, data related to AQSIQ transactions, not to commissions for introductions), requested data from plaintiff, dragged out negotiations, and assured plaintiff that defendant would not shortchange or harm plaintiff or their working relationship (see Pl.'s Surreply 18–19)—are similarly unavailing. They do not amount to "fraud, misrepresentations or deception" that "induced" plaintiff to refrain from filing a timely action. Golden Budha, 931 F.2d at 200 (emphasis added).

objectively unreasonable, and does not support a theory of equitable estoppel. No evidence demonstrates or even suggests that Mammone or defendants "induced" plaintiff to forbear exercising its rights under the Agreement, as required by the doctrine. Golden Budha, 931 F.2d at 200. Plaintiff was on notice as early as December 2009 that defendants did not intend to pay plaintiff for any alleged introductions to the entities on Exhibit B to the amended complaint, and could certainly have exercised its rights on those claims earlier than June 2012.

Finally, plaintiff argues that the continuing wrong doctrine applies to any claims filed before June 2012. "Despite the general principle that a cause of action accrues when the wrong is done, regardless of when it is discovered, certain wrongs are considered to be continuing wrongs, and the statute of limitations, therefore, runs from the commission of the last wrongful act." Leonhard v. United States, 633 F.2d 599, 613 (2d Cir. 1980), cert. denied, 101 S. Ct. 1975 (1981); see also Guilbert v. Gardner, 480 F.3d 140, 150 (2d Cir. 2007) (emphasis added) ("If . . . a contract requires continuing performance over a period of time, each successive breach may begin the statute of limitations running anew."). Using that theory, plaintiff asserts that the statute of limitations runs from September 4, 2013—the end of the period during which defendants traded with eight of the parties to which plaintiff allegedly introduced defendant. (See Pl.'s Opp. 15 (citing Shull Decl. ¶ 5, ECF No. 27).)

Plaintiff is incorrect. The continuing wrong doctrine only "applies when the defendant's conduct causes plaintiff to sustain damages after the time when the statute of limitations would have expired if it commenced at the time of defendant's

first act." Kahn v. Kohlberg, Kravis, Roberts & Co., 970 F.2d 1030, 1039 (2d Cir. 1992). That is, the doctrine applies to cases where "conduct by the defendant may give rise to damages in the future which are not predictable at the time of the initial act or within the limitations period." Id. (citing Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263, 295–96 (2d Cir. 1979), cert. denied, 444 U.S. 1093 (1980)). Here, by contrast, assuming that a breach of the contract occurred, damages were apparent and calculable once defendants refused to pay plaintiff for introductions that plaintiff claimed to have made. To the extent that plaintiff asserts simply an ongoing breach of the contract—with damages increasing as the breach continued—the continuing wrong theory does not apply. See Kahn, 970 F.2d at 1041 (explaining that plaintiffs could not use the continuing wrong theory for an "ongoing" violation, because "performance under the contract merely affects damages and does not give rise to a new cause of action"); see also Barbara v. MarineMax, Inc., No. 12 Civ. 368 (ARR), 2012 WL 6025604, at *7 (E.D.N.Y. Dec. 4, 2012) (explaining that the continuing wrong doctrine applies where "the cause of action [including the element of damages] does not accrue until the last act of the continuing wrong").

Plaintiff spills much ink in its attempts to avoid the statute of limitations, but its arguments are unavailing. Its complaint is time-barred as to any claims related to trading occurring before June 11, 2012.

E. Breach of Contract as to Trades After June 11, 2012

The statute of limitations does not, however, bar plaintiff's breach of contract claim as to defendants' trading that occurred after June 11, 2012—one year prior to plaintiff's filing the complaint.  The Agreement contemplates individual payments based on sales and other trading transactions with third parties to whom plaintiff introduced defendant.[4]  Thus, each failure to pay plaintiff a commission for a transaction with a party to whom plaintiff introduced defendant is a separate breach of the contract.

Plaintiff proffers evidence that defendants traded with eight companies to whom plaintiff had allegedly introduced defendant after June 11, 2012, and continuing to September 4, 2013.  (Shull Decl. ¶ 5.)  However, plaintiff also presents evidence that defendant did not pay plaintiff for those trades.  (See Pena Decl. Ex. B (showing that no payments occurred after June 6, 2011).)  Therefore, plaintiff's breach of contract claim shall proceed as to unpaid commissions based on any trading occurring after June 11, 2012.

F. AQSIQ Claim

Defendants argue that plaintiffs' AQSIQ claim must be dismissed because it was insufficiently pled and because the email agreement upon which plaintiff relies is invalid under the Agreement's integration clause.

---

[4] The language of the Agreement is somewhat ambiguous as to whether "a commission on all introductions" is meant to signify only one commission per introduced party or a commission on each transaction with an introduced party.  However, the course of conduct of the parties—specifically the fact that defendants made multiple payments to plaintiff per allegedly introduced company (Pena Decl. Ex. B)—indicates that they may have viewed it as the latter.  Therefore, plaintiff's breach of contract claim may proceed based on trading that occurred with companies after June 11, 2012, even if plaintiff had allegedly introduced those companies to defendant prior to that date.

The Court agrees that, based on the Agreement's integration clause, the AQSIQ agreement cannot form part of the Agreement. (See Agreement ¶ 8 ("This instrument contains the entire agreement of the Parties with respect to the subject matter hereof, and the terms and conditions thereof may not be further modified except by a writing signed by both Parties.").)  Defendant is correct that an oral agreement and email cannot alter the Agreement.  However, that Agreement was related to commissions for introductions, not for use of plaintiff's AQSIQ license.  Any contract between the parties based on the use of plaintiff's AQSIQ license stands apart from the Agreement.  The facts related to plaintiff's AQSIQ license therefore do not form a part of plaintiff's first cause of action, which alleges a breach of contract of the Agreement.

However, while the Court agrees that plaintiff's AQSIQ claim has taken a backseat to its central claims during this litigation, plaintiff nonetheless has sufficiently pled the AQSIQ claim.  Paragraphs 85 to 104 of the complaint describe the events by which plaintiff agreed to allow defendant to trade with China using plaintiff's AQSIQ in exchange for a $5-per-ton fee.  While plaintiff's first cause of action refers explicitly to the Agency Agreement, plaintiff's quasi-contract causes of action refer generally to "deceptive and improper conduct," "substantial pecuniary benefit," and "clear and definite promises, representations and commitments." (Am. Compl. ¶¶ 123, 127, 128.)  The second and third quasi-contract causes of action therefore encompass plaintiff's AQSIQ claim, insofar as the Agreement itself does not cover the AQSIQ license.  See Clark-Fitzpatrick, 70 N.Y.2d at 388–89.

The Court is mindful that the record is thin on the AQSIQ issue, and that plaintiff has not put forward an amount that it claims it is owed.  However, plaintiff has proffered certain facts supporting its theory.  Defendant twice shipped metal containing ammunition shells.  (Rosenstrauch Decl. ¶ 79.)  As a result, plaintiff incurred further supervision fees on future shipments.  (Pena Decl. ¶ 7, Ex. D.)  Based on those declarations, plaintiff's quasi-contract claims may proceed as to the AQSIQ license.

IV.    CONCLUSION

For these reasons, defendants' motion for summary judgment is GRANTED IN PART on (1) plaintiff's quasi-contract claims with respect to commissions for introductions and (2) plaintiff's breach-of-contract claims based on transactions occurring before June 11, 2012; and DENIED IN PART on (1) plaintiff's claims against defendant INTL FCStone, (2) the issue of waiver of Exhibit I of the Agreement, (3) plaintiff's breach-of-contract claims based on transactions occurring after June 11, 2012, and (4) plaintiff's quasi-contract claims with respect to the AQSIQ license.

The Clerk of Court shall close the motion at ECF No. 23.

The parties shall appear for a status conference on **Monday, March 10, 2014, at 3:00 p.m.** to discuss further proceedings in this matter, including trial.

SO ORDERED.

Dated:      New York, New York
            February 26, 2014

_____
KATHERINE B. FORREST
United States District Judge